UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Melvin Graham</u>

    v.                                                 Case No. 07-cv-247-PB
                                                        Opinion No. 2009 DNH 167

<u>Stephen Curry, Larry
Blaisdell, John Loven,
Mark Nadeau, Dwane Sweatt,
and Scott Newton</u>

### MEMORANDUM AND ORDER

Melvin Graham, an inmate at the Northern New Hampshire Correctional Facility ("NCF"), has sued Stephen Curry, Larry Blaisdell, John Loven, Mark Nadeau, Dwane Sweatt, and Scott Newton pursuant to 42 U.S.C. § 1983, alleging violations of his Fourth and Eighth Amendment rights.[1]  Graham has also asserted a state law claim of intentional infliction of emotional distress. The defendants have filed a motion for summary judgment on all counts.  Graham objects.  For the reasons set forth below, I grant the motion.

---

[1] Curry is a former commissioner of the New Hampshire Department of Corrections ("NHDOC").  Blaisdell is the warden at the Northern New Hampshire Correctional Facility ("NCF").  Loven, Nadeau, Sweatt, and Newton are corrections officers at NCF.

## I.   BACKGROUND

Graham's allegations arise from two separate searches:  one on June 2, 2005 ("the June search") and one on July 8, 2005 ("the July search").  Both searches were conducted in furtherance of a larger effort by prison officials to respond to information suggesting that inmates were smuggling marijuana or tobacco from the prison's kitchen into other areas of the prison.

### A.   The June Search[2]

On June 2, 2005, Graham was stopped as he was leaving his job in the NCF kitchen. (Compl., Doc. No. 1-1, at 2.) Sergeant Huter (who is not a named defendant) instructed Graham to proceed to a large open area known as the "Industries Area." (Id.) Fifteen other inmates were directed to the same area. (Id.) Nadeau, under Loven's direct supervision, then allegedly conducted a visual body cavity ("VBC") search[3] of Graham in full

---

[2] Although Graham's complaint alleges that the first search occurred on June 6, 2005, he later states that the search occurred on June 2, 2005, which is also consistent with prison records. (See Defs.' Mem. of Law in Supp. of Mot. for Summ. J., Doc. No. 25-2, at 2 n.1.)

[3] Graham refers to these searches as "strip searches" in his complaint. (See Compl., Doc. No. 1-1, at 2-3.)  However, the searches he describes, in which he "opened his mouth, wagged his tongue, pulled his ears forward, lifted his scrotum, turned around and bent over, spreading his buttocks apart, and lifted

-2-

view of the other inmates[4] and a surveillance camera allegedly monitored by female corrections officers. (Id. at 2-3.) Graham objected to the fact that the camera was on but was told to shut up and strip, an order that he obeyed. (Id. at 2.) Graham claims that there was a room "built specifically for conducting strip searches" near where his VBC search took place. (See id. at 3.)

Other inmates were found to be in possession of tobacco and contraband food items during the June search. (Loven. Aff., Doc. No. 25-7, ¶ 3.)

---

his feet for inspection" is more accurately described as a visual body cavity search, and this order refers to it as such. (See id. at 4.)

[4] Defendants have produced an affidavit from Nadeau asserting that "[i]f an inmate was strip searched, he was pulled aside around a corner so that he would be out of the view of the other inmates while being strip searched." (Nadeau Aff., Doc. No. 25-9, ¶ 14 (emphasis added).) In their memorandum, however, defendants cite Nadeau's affidavit for the proposition that "[i]f an inmate was strip searched, he was pulled aside into a corner so that he would be out of the view of the other inmates while being strip searched." (Defs.' Mem. of Law in Supp. of Mot. for Summ. J., Doc. No. 25-2, at 3 (emphasis added).) Graham disputes Nadeau's assertion that he was taken around a corner to be strip searched but he does not take a position on defendants' alternative contention that any strip searches were conducted in a corner of the Industries Area. He does continue to maintain, however, that he was strip searched in full view of other inmates. I accept Graham's contention with respect to this disputed issue when ruling on defendants' summary judgment motion.

**B.     The July Search**

On July 8, 2005, as Graham was leaving his job in the NCF kitchen, all of the kitchen workers were being detained in the hallway so that corrections officers could conduct VBC searches. (Compl., Doc. No. 1-1, at 4.)  Graham was standing fourth in line when the three inmates in front of him were called into the laundry room to be searched.  (Id.)  Graham asserts that "it has [always] been procedure to take three inmates at a time in[to] the laundry room."  (Id.)  However, on this day, Nadeau, against whom Graham had previously filed a grievance based upon the June search, allegedly noticed Graham in the hallway and asked Graham and a trainee to come into the laundry room with the other inmates.  (Id.)  Graham followed normal VBC search procedures by opening his mouth, wagging his tongue, pulling his ears forward, lifting his scrotum, turning around and bending over, spreading his buttocks, and lifting his feet for inspection.  (Id.)  The trainee then told Graham to give him his glasses.  (Id.)  Graham did not want to give the trainee his glasses until the trainee had changed his gloves.  (Id.)  After the trainee commanded Graham twice more to give him the glasses and Graham refused, Sweatt handcuffed Graham.  (Id. at 4-5.)  As Newton arrived,

Graham asked, "You're not going to lug me down the hall naked are you?" (Id. at 5.) Sweatt answered, "Yes." (Id.) Newton then told Sweatt to let Graham put his undershorts on, which Sweatt did. (Id.) Graham was then "marched out into the hallway where the other inmates were awaiting their turn . . . and then out into the main corridor of NCF." (Id.) Graham "tried to protest to Sweatt that his shorts were ripped out in front and that his penis was hanging out[,] but Sweatt only smiled and told [him] to shut up." (Id.) During his walk to the holding cell, Graham allegedly sustained contusions on both heels and aggravated an existing spinal injury. (Id.) Graham claims that as he neared the "holding tank," which was near the visiting area, he "could see women and children coming and going from the area," and notes that "presumably[] they could see [him] in his embarrassing and humiliating expose [sic]." (Id.) The corrections officers then locked Graham in a holding cell for "about three hours" without blankets, clothes, or his glasses, which Graham claims resulted in a headache. (Id.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The evidence submitted in support of the motion for summary judgment must be considered in the light most favorable to the nonmoving party, indulging all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.  The opposing party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

### III. ANALYSIS

Graham argues that defendants violated his Fourth Amendment rights when they conducted the June search and violated his Eighth Amendment rights when they conducted the July search.[5] He also asserts that both searches support a state law claim for intentional infliction of emotional distress. Defendants respond by claiming that they are entitled to qualified immunity with respect to the federal claims and that Graham cannot prove his state law claim.

#### A. Qualified Immunity Test

To determine whether a defendant charged with a constitutional violation is entitled to qualified immunity, a court must ask

---

[5] The magistrate judge construed Graham's complaint to assert Fourth and Eighth Amendment violations with respect to both searches. (See Report and Recommendation, Doc. No. 4, at 8-15.) The proffered facts, however, do not support either a claim that the June search violated the Eighth Amendment or that the July search violated the Fourth Amendment. The June search will not support an Eighth Amendment claim because there is no evidence in the record to support a claim that Nadeau was acting maliciously when he conducted the June search. See Meriwether v. Faulkner, 821 F.2d 408, 418 (7th Cir. 1987) (malicious intent required to support Eighth Amendment claim challenging a prison search). The July search does not state a Fourth Amendment violation because Graham primarily challenges the constitutionality of what occurred after the search was completed rather than the search itself.

> (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation.

Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). A court ordinarily may move directly to the second step in the analysis and award qualified immunity if the plaintiff cannot demonstrate that the right on which his claim is based was clearly established when the defendants engaged in the conduct at issue. Pearson v. Callahan, 129 S. Ct. 808, 817-18 (2009). In determining whether a constitutional right was clearly established, the court must look both at "the clarity of the law at the time of the alleged civil rights violation," and the way in which the law applies "in light of the specific context of the case, not as a broad general proposition." Maldonado, 568 F.3d at 269 (internal quotations omitted). Ultimately, the question that the court must ask is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004)).

## B.  **Fourth Amendment Claim:  The June Search**

Graham does not challenge Nadeau's authority to subject him to a VBC search. Instead, he claims that the search was unlawful

-8-

because Nadeau conducted the search in the presence of the other inmates.[6]  Graham also seeks to hold Loven, Curry, and Blaisdell liable on a supervisory liability theory.  Defendants deny that other inmates were able to witness the search, but argue that they are entitled to qualified immunity in any event both because they did not violate the Fourth Amendment even if Graham's factual assertions are accepted as true and because reasonable correctional officers would not have clearly understood that it was unlawful under the circumstances to conduct the search in the presence of other inmates.

Visual body cavity searches, though intrusive, are an important tool for maintaining order and security in prisons and are permitted in many situations.  See, e.g., Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983); Bell v. Wolfish, 441 U.S. 520 (1979).  However, the right to search prisoners is not unlimited.  "Prisoners, even though incarcerated, have some degree of Fourth Amendment protection, and this protection extends to shielding

---

[6] Graham also asserts that the search was unlawful because female guards watched the search on a surveillance camera.  The evidence does not support this contention, however, because Graham has failed to identify evidence that contradicts other evidence supplied by the defendants that demonstrates that no female guards were monitoring the surveillance camera when the search occurred.

prisoners from unreasonable visual cavity searches."  Seaver v. Manduco, 178 F. Supp. 2d 30, 38 (D. Mass. 2002) (citing Arruda, 710 F.2d 886).  To determine whether a search is unreasonable, a court must "balanc[e] . . . the need for the particular search against the invasion of personal rights that [it] entails." Wolfish, 441 U.S. at 559.  "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  Id.  A court should "evaluate 'prison practice . . . in light of the central objective of prison administration, safeguarding institutional security,'" and "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"  Arruda, 710 F.2d at 887 (quoting Wolfish, 441 U.S. at 547).

    Although the First Circuit has not addressed the specific issue presented in this case, other courts have recognized that the Fourth Amendment bars a correctional officer from conducting a VBC search in the presence of other inmates unless the officer's decision to conduct the search in that manner is

reasonably related to a legitimate penological interest.[7]  Farmer v. Perrill, 288 F.3d 1254, 1259-60 (10th Cir. 2002); Thompson, 111 F.3d at 699-701; Sabree v. Conley, 815 N.E.2d 280, 283 (Mass. App. Ct. 2004).  The Tenth Circuit had also held that this right was clearly established long before the June search was conducted.  Farmer, 288 F.3d at 1260.

Nadeau presents two related arguments to support his contention that he is entitled to summary judgment with respect to his qualified immunity defense.  First, he asserts that the search was constitutional even if it was conducted in "full view" of the other inmates because the search procedure he followed was reasonably related to legitimate penological interests. Alternatively, he argues that he is entitled to qualified

---

[7] The legitimate penological interest standard is drawn from the Supreme Court's decision in Turner v. Safley, 482 U.S. 78, 89 (1987).  Although at least one court has suggested that Turner may not apply to Fourth Amendment claims, see Powell v. Barnett, 541 F.3d 1298, 1302-03 (11th Cir. 2008), other circuits have held that Turner provides the governing standard in determining whether an inmate search violates the Fourth Amendment, see Thompson v. Souza, 111 F.3d 694, 699-700 (9th Cir. 1997); Covino v. Patrissi, 967 F.2d 73, 78-79 (2d Cir. 1992).  The First Circuit has not taken a position on this issue and I need not do so here to resolve the case.  Instead, it is sufficient to note that in the context of this case, in which the only issue is whether it was reasonable to conduct a VBC search in the presence of other inmates, the search was unreasonable and hence violated the Fourth Amendment only if the search procedure the officers used was unrelated to a legitimate penological interest.

immunity even if he violated the Fourth Amendment because a reasonable correctional officer would not have clearly understood that his alleged search procedure was unlawful.  I skip Nadeau's first argument and explain why his second argument is persuasive.

Because Graham claims that Nadeau could have searched him in a nearby private room, Nadeau's qualified immunity defense turns on whether a reasonable correctional officer could have believed that there was a legitimate penological justification for conducting the search in the Industries Area rather than in the private room.  Defendants assert that Nadeau searched Graham in the Industries Area because defendants needed "to keep a close eye on the inmates and ensure that contraband was not passed between inmates" while the VBC searches were conducted.  (Loven Aff., Doc. No. 25-7, ¶ 5.)  Although a credible argument can be made that Loven and Nadeau could have safely taken Graham to the private room to be searched while leaving Huter to watch the other inmates, I cannot say that a reasonable officer in Nadeau's position would have clearly understood that there was no need to conduct the search in the Industries Area to maintain control over the other inmates who were waiting to be searched.  The Supreme Court has made it clear that courts must give "wide-ranging deference" to the judgments that correctional officers

make concerning matters of institutional security.  Wolfish, 441 U.S. at 547.  Here, defendants reasonably could have concluded that two officers were needed to conduct the VBC search of Graham and that Huter was not able to watch the other inmates by himself while Graham was being searched.  Absent evidence that other guards could have been called to the scene without compromising security interests elsewhere, a matter about which I have no evidence, it was reasonable for defendants to conclude that the VBC search of Graham needed to be conducted in the Industries Area even if that meant that other inmates might witness the search.  Thus, Nadeau is entitled to qualified immunity with respect to the June search.

Graham's supervisory liability claims against Loven, Blaisdell, and Curry fail for similar reasons.  Graham appears to claim that Loven is liable as a supervisor because he was a "primary actor" involved in Nadeau's allegedly unconstitutional conduct.  See Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999) (distinguishing between supervisors who are "primary actors" involved in a constitutional violation and supervisors who are allegedly liable because they acted with deliberate indifference in hiring, training or supervising a subordinate). The First Circuit has explained that the qualified immunity test

works in the same way with respect to supervisors that are charged as primary violators as it does with respect to defendants who are sued as principals.  Id. at 44.  Thus, Loven is entitled to qualified immunity for the same reason as Nadeau.  Graham's claims against Blaisdell and Curry appear to be based on a generalized contention that they failed to properly supervise Loven and Nadeau.  These types of claims require proof of deliberate indifference.  Id.  Because the record contains no evidence to support a claim that either Blaisdell or Curry acted with deliberate indifference, they are entitled to qualified immunity as well.

## C.     **Eighth Amendment Claim:   The July Search**

In order to establish an Eighth Amendment violation, Graham "must meet both objective and subjective criteria."  Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Graham must demonstrate that his alleged deprivation is objectively so severe that he has been denied "the minimal civilized measure of life's necessities."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation omitted).  Additionally, he must show that prison officials acted with "a sufficiently culpable state of mind."  Id. at 8 (internal quotation omitted).  In the context of bodily searches performed

-14-

on inmates, only searches that are "maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification'" are unconstitutional. Meriwether v. Faulker, 821 F.2d 408, 418 (7th Cir. 1987) (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)). To the extent that an inmate otherwise claims that the conditions under which he is confined are so intolerable that they amount to an Eighth Amendment violation, the mental state required is deliberate indifference. Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999).

Graham's only claim with respect to the search itself is that Nadeau maliciously instigated the search. Graham supports this challenge with evidence: (1) that he challenged the June search in a grievance at some point prior to the July search; and (2) that Nadeau called him into the laundry room to be searched after three other inmates were already in the room when, in his previous experience, only three inmates had ever been searched at once in the laundry room. (See Compl., Doc. No. 1-1, at 4.) Neither of these allegations establishes that Nadeau acted with malicious intent. Graham has demonstrated a temporal relationship between the filing of the grievance and the second search but no causal relationship between the two. Nothing about the search suggests that Graham was being personally targeted.

Many other inmates were randomly searched in June and July.  (See Defs.' Mem. of Law in Supp. of Mot. for Summ. J., Doc. No. 25-2, at 9-10.)  In addition, although Graham claims that it was "customarily the procedure" to take three inmates at a time into the laundry room, he has no basis for making that conclusion aside from having been searched there "on several occasions." (See Compl., Doc. No. 1-1, at 4.)  Thus, the fact that Nadeau called him into the room as a fourth person does not establish that Nadeau acted with malicious intent.

Graham also alleges that Nadeau, Sweatt, and Newton violated his Eighth Amendment rights by making him walk approximately a quarter of a mile to a holding cell in his undershorts and with his penis exposed so that it could be seen by female and child visitors.  (See Compl., Doc. No. 1-1, at 5.)  There is a genuine dispute as to whether Graham's penis was hanging out of his undershorts.  Graham claims that he "tried to protest to Sweatt that his shorts were ripped out in front and that his penis was hanging out."  (See id.)  Sweatt, however, claims that he never noticed Graham's penis, and denies that Graham ever complained to him about the situation.  (See Defs.' Mem. of Law in Supp. of Mot. for Summ. J., Doc. No. 25-2, at 4.)  Nadeau also claims that he did not notice that Graham's penis was exposed when Graham

-16-

left the laundry area to be escorted to the holding cell.  (See id.)  There is, however, no genuine dispute as to whether women and children actually saw Graham walking down the hallway.  The defendants claim that women and children did not see Graham. (See id. at 4-5.)  Graham's only support for his contrary allegation is that as he neared the holding cell, he "could see women and children coming and going from the [visiting] area, so presumably[] they could see [him]."  (See Compl., Doc. No. 1-1, at 5.)  Graham has no personal knowledge to support his allegation that any visitors actually saw him or his exposed penis.  Thus, the most that Graham can claim with respect to the walk from the laundry room to the holding cell is that he was forced to walk to the holding cell in ripped undershorts that left his penis exposed.  These allegations do not amount to the kind of extreme deprivations that are necessary to support an Eighth Amendment claim.

Finally, Graham alleges that defendants violated his rights under the Eighth Amendment by locking him in a holding cell for "about three hours" without a blanket, clothes, a companion, or his glasses.  (See Compl., Doc. No. 1-1, at 5; see also Def.'s Ex. A-3, Doc. 25-6, at 1 (indicating that Graham was only in the holding cell for two hours).)  Again, however, Graham fails to

-17-

present evidence of the kind of egregious deprivations that are necessary to support an Eighth Amendment claim. Accordingly, defendants are entitled to qualified immunity with respect to Graham's Eighth Amendment claim.

## D. **Intentional Infliction of Emotional Distress**

Graham alleges that the defendants intentionally inflicted emotional distress on him by subjecting him to unreasonable and malicious strip searches. In New Hampshire, a defendant "'who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for that emotional distress.'" Amatucci v. Hamilton, 2007 DNH 080, 6 (quoting Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998)). The conduct upon which the claim is based must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). Here, the evidence does not establish that the defendants' conduct was "outrageous" when they searched Graham on June 2, 2005, or when they searched him, walked him down the hall to the holding tank, and kept him in the holding tank for two hours on July 8, 2005. Graham has also failed to provide evidence from

which a reasonable jury could infer that the guards intentionally caused severe emotional distress.  Thus, I dismiss the state law claim for intentional infliction of emotional distress.

## IV.  CONCLUSION

For all of the foregoing reasons, I grant the defendants' motion for summary judgment (Doc. No. 25).

SO ORDERED.

```
                                /s/Paul Barbadoro
                                Paul Barbadoro
                                United States District Judge
```

November 9, 2009

cc:  Melvin Graham, pro se
     Laura E. B. Lombardi, Esq.